[No. H033422. Sixth Dist. Dec. 2, 2009.]

PREDIWAVE CORPORATION, Plaintiff and Appellant, v.
SIMPSON THACHER & BARTLETT LLP et al., Defendants and
Respondents.

**COUNSEL**

Squire, Sanders & Dempsey, Douglas J. Rovens, Steven A. Lamb, Gabriel Colwell, Horvitz & Levy and Jeremy Rosen for Plaintiff and Appellant.

Munger, Tolles & Olson, Brad D. Brian, Bradley S. Phillips and Aimee Feinberg for Defendants and Respondents.

# OPINION

**ELIA, J.**—PrediWave Corporation (PrediWave) sued Simpson Thacher & Bartlett LLP (defendant law firm), Attorney George M. Newcombe, and Attorney Alexis S. Coll-Very, who had previously represented both PrediWave and its former president and CEO, Jianping "Tony" Qu (Qu). Defendants successfully brought a special motion to strike under the anti-SLAPP statute (Code Civ. Proc., § 425.16).[1] PrediWave appeals from the order granting the motion.[2] (§§ 425.16, subd. (i), 904.1.)

We reverse.

## A. *Procedural History and Background*

Appellant PrediWave filed a complaint for damages stating four causes of action: (1) breach of fiduciary duty by defendants, (2) constructive fraud by defendants, (3) legal malpractice by defendants, and (4) violation of Business and Professions Code section 17200 et seq. by defendant law firm.

On June 10, 2008, defendants filed an anti-SLAPP motion pursuant to section 425.16. Appellant PrediWave subsequently filed a first amended complaint.[3] The trial court did not consider this latter complaint in ruling on the anti-SLAPP motion. (See *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1052, 1054–1056 [18 Cal.Rptr.3d 882] [no right to avoid an anti-SLAPP motion by filing an amended complaint pursuant to § 472 prior to the hearing on the motion]; *Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 772 [131 Cal.Rptr.2d 201] [refusing leave to amend to assert a cause of action for malicious prosecution because plaintiff cannot use "eleventh-hour amendment" to plead around anti-SLAPP motion]; *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073–1074

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [3 Cal.Rptr.3d 636, 74 P.3d 737].) All further unspecified statutory references are to the Code of Civil Procedure.

[2] We have considered, and now grant, PrediWave's motion to strike respondents' appendix and any references to that appendix in respondents' brief.

[3] The first amended complaint contains six causes of action: (1) breach of fiduciary duty by defendants, (2) constructive fraud by defendants, (3) professional negligence involving a conflict of interest by defendants, (4) professional negligence involving active concealment by defendants, (5) unfair business practices by defendant law firm, and (6) fraudulent concealment by defendants. This complaint alleges that defendants did question and investigate Qu and the investigation resulted in findings in or around May 2005 confirming that Qu had defrauded PrediWave. It continues to allege that, in June 2005, defendant withdrew as counsel for PrediWave, related entities, and Qu. The first amended complaint contains additional allegations regarding defendants' alleged failures to disclose information regarding Qu to PrediWave's board of directors.

[112 Cal.Rptr.2d 397] [no express or implied right in § 425.16 to be granted leave to amend complaint]; but see *Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 873 [90 Cal.Rptr.3d 205] ["trial court did not err in permitting plaintiff to amend her complaint to plead actual malice in conformity with the proof presented at the hearing on the strike motion"].)

The original complaint states that PrediWave was organized and exists under the laws of the State of California with its principal place of business in Fremont, California. According to the complaint, defendants began representing PrediWave in early May 2004. Defendants also represented PrediWave, its affiliated companies, and CEO Qu in litigation with New World TMT Limited (New World). In June 2005, defendants withdrew as counsel for PrediWave, its companies, and Qu. Defendant law firm received $10 million for representing PrediWave.

The complaint alleges that Qu perpetrated fraud upon New World by making false representations and withholding material information regarding PrediWave products. Qu allegedly induced New World to purchase all PrediWave's preferred shares for $35 million, to spend over $381 million to purchase PrediWave's defective video on demand (VOD) set-top box (STB) and related hardware and software, and to invest $256.4 million in the purchase of all the preferred shares of affiliated companies.

The complaint alleges that, pursuant to the PrediWave preferred stock purchase agreement, New World appointed two board directors, Douglas Chan and Fu Sze Shing (Fu) to PrediWave's board of directors and they served from 2000 to April 2004. According to the complaint, on April 23, 2004, New World's chairman, Dr. Henry Cheng, "cancelled New World's outstanding VOD STB order" and, on April 24, 2004, New World replaced Chan with Jimmy Li as its second outside director.

The complaint indicates that directors Li and Fu became aware of purported board resolutions approving bonuses of over $95 million to Qu and other corporate spending for Qu's benefit and alleged that the two directors "became concerned that Qu was diverting millions of dollars in assets from PrediWave." It states that, on April 28, 2004, the two directors sent a letter to Qu informing him that they were exercising their right as PrediWave directors to inspect PrediWave's books and records pursuant to the Corporations Code. On April 29, 2004, they sent letters to PrediWave's financial institutions informing them that they were commencing an audit and any withdrawal over

$500,000 was required to be cosigned by a New World representative and requesting a summary of PrediWave's accounts and notice of withdrawals exceeding $500,000 (referred to in the complaint as the "Bank Letters").

The complaint states: "On May 3 and 13, 2004, New World sent additional letters to Prediwave rejecting and/or revoking its acceptance of the VOD STBs and all other goods supporting the VOD STBs, and notifying Prediwave that it was in breach of the parties' agreements and warranties."

The complaint indicates that, after being hired, defendants "conferred with Qu" and the common stock board members and, on May 19, 2004, defendants filed "a peremptory lawsuit" in Los Angeles County (the L.A. action) against the two outside directors instead of investigating their claims or recommending to the board that an independent investigation of the "merits of their allegations" be conducted. According to the complaint, the L.A. action "falsely accused" the two directors of breaching their fiduciary duties to PrediWave "by requesting to inspect PrediWave's books and records and seeking to investigate fraud by PrediWave's management" and by sending the Bank Letters. The L.A. action sought to block their inspection of corporate books and records. The present complaint alleges that the next day, May 20, 2004, defendants sought a temporary restraining order (TRO) and preliminary injunction against the two outside directors and these "aggressive tactics were designed to impede Messrs. Li and Fu's investigation." According to the complaint, the trial court denied the TRO and defendants subsequently withdrew the application for a preliminary injunction.

The complaint further alleges that, when director Li was "en route to PrediWave's offices" on May 24, 2004, for an arranged inspection of PrediWave's books and records, defendants notified Li that permission to inspect would be denied unless Li "signed an agreement imposing strict limits on his use of the books and records—limits far more draconian than those involving trade secrets and confidential information to which Mr. Li's counsel had agreed in principle." When Li did not agree, defendants refused to permit Li access to PrediWave's books and records.

The complaint indicates that, on May 25, 2004, New World filed a lawsuit against PrediWave, its affiliated companies, and Qu in Santa Clara County (the Santa Clara action). It avers that New World's Santa Clara action alleged fraud, breach of contract, negligent misrepresentation, and breach of fiduciary duties by Qu and PrediWave and specified, among other things, that Qu had "looted PrediWave and its affiliates of more than $100 million in unearned 'bonuses' and other abusive perquisites" and had "defrauded New World into investing in PrediWave and its affiliates . . . ."

The complaint in this case states that Li was forced to file a petition for writ of mandate to enforce his right to inspect PrediWave's books and records. Defendants unsuccessfully sought to disqualify Li's counsel in that proceeding and PrediWave appealed the ruling, allegedly "as a tactic to further delay inspection of PrediWave's books and records."

The complaint states that defendants "stonewalled discovery" in the L.A. action "to prevent . . . Li and Fu from obtaining documentary evidence of Qu's theft of funds, thereby enabling Qu's fraud." The complaint alleges that defendants "adopted a strategy of delaying and blocking written and oral discovery" in the L.A. and Santa Clara actions. This led to "significant motion practice," which "resulted in significant delay and concomitant cost to PrediWave, and facilitated Qu's continued fraud and theft of PrediWave assets." It asserts that the irreconcilable conflict of interest obstructed Li and Fu's attempts to uncover Qu's fraud and theft of funds, enabled Qu to continue looting PrediWave, and "unnecessarily extended litigation that should have been resolved without incurring millions in legal fees."

After a court issued a writ of mandate, documents were produced but defendants stamped them "confidential" and took the position that the documents could not be used in the L.A. and Santa Clara actions. The present complaint states that the pleading in the L.A. action was amended to "claim erroneously that Mr. Li also breached his fiduciary duty to PrediWave by conducting a review of PrediWave's corporate documents pursuant to his rights under the California Corporations Code."

The complaint recites that, in July 2004, New World appointed Bruce Keiser as a PrediWave director, a replacement for Fu.

The complaint indicates that, in August 2004, PrediWave paid Qu "a $25 million bonus . . . that had allegedly been approved by PrediWave's Board in January 2004." The complaint also states that Qu caused himself to be paid a $25 million bonus in December 2004.

The complaint indicates that, at his May 17, 2005 deposition in the L.A. action, Qu, while being represented by defendants, denied that PrediWave's transactions with a company called Modern Office Technology (MOT) constituted fraud despite being presented with certain documents suggesting MOT had ties to Qu's family. According to the complaint, it was eventually proven in New World's Santa Clara action that "MOT was a 'dummy' company through which Qu inflated the price of component parts to the PrediWave System" and the "marked-up prices accrued to the benefit of MOT, which

held bank accounts in China opened by Qu's mother." It states that "[b]loated profits of approximately US$35 million were generated by MOT" and "[t]his scheme defrauded both PrediWave and New World." The complaint alleges that defendants "failed to investigate whether Qu and his family or friends controlled MOT, whether MOT in fact existed as a real business, and whether the MOT transactions were legitimate, or sham transactions costing PrediWave and New World millions of dollars."

According to the complaint, in December 2005, when defendants were no longer representing PrediWave or Qu, Qu transferred $40.8 million from his Merrill Lynch account in San Francisco to an overseas account.

The complaint indicates that, on March 29, 2006, New World obtained a preliminary injunction against PrediWave and several PrediWave companies and a writ of attachment it then levied on PrediWave's bank accounts. On April 14, 2006, PrediWave filed for bankruptcy protection.[4] It is alleged that, on July 6, 2006, New World obtained relief from the automatic bankruptcy stay in order to prosecute its claims.

The complaint alleges that, in July and August 2006, Qu sold two of his real properties for a total of $5.65 million.

According to the complaint, on October 10, 2006, New World filed a motion for terminating sanctions in the Santa Clara action. On October 11, 2006, Qu was ordered to appear for deposition, mandatory settlement conference, and trial on October 13, 2006. Qu did not appear. The court granted New World's motion for terminating sanctions against Qu, PrediWave, and the PrediWave companies.

The complaint states that, on November 7, 2006, Qu sold his last California home for $1 million.

The complaint alleges that Qu looted PrediWave for more than $100 million. It also states that Qu has fled this country.

According to the complaint, judgment was entered in favor of New World in the Santa Clara action. Ultimately, New World obtained a judgment for $2,817,075,320.20, which included $2 billion in punitive damages.

---

[4] We grant defendants' request that this court take judicial notice of the July 2008 bankruptcy order dismissing PrediWave's chapter 11 case. (Evid. Code, §§ 452, 459.)

The complaint charges defendants with failing to advise PrediWave's board of directors about the "irreconcilable conflict of interest in representing both PrediWave and its affiliated companies on one hand and Qu on the other," failing to recommend to the board that an independent investigation of the allegations against Qu be conducted, failing to conduct "a reasonable, independent investigation of Qu and of the various transactions whereby Qu was looting PrediWave," and failing to establish "an Independent Audit Committee represented by separate and independent counsel . . . ."

The complaint further alleges that defendants acted against PrediWave's best interests by taking direction from Qu and by "tailor[ing] the defense of the Santa Clara Action and other legal actions to favor Qu . . . ." It further states that defendants "failed to protect PrediWave by, at a minimum, requiring an arrangement with Qu to ensure that Qu would reimburse PrediWave for attorneys' fees advanced for Qu's defense . . . ."

The complaint also states that defendant "did nothing to stop PrediWave from paying [the $25 million] bonus to Qu in August 2004." It alleges that defendants' failure to disclose "Qu's illicit activities to the PrediWave Board, or to take any affirmative action to otherwise protect Prediwave" enabled Qu to transfer $40.8 million out of the country in December 2005 (a date subsequent to defendants' withdrawal as counsel). It charges defendants with refusing to "take steps to preserve PrediWave's assets and claims against Qu" and failing "to resolve the lawsuit with New World" because of the conflict of interest. The complaint states that the conflict of interest "unnecessarily extended litigation that should have been resolved without incurring millions in legal fees."

The individual causes of action incorporate by reference the general allegations. The first cause of action alleges that, "by reason of the acts and omissions alleged herein," defendants breached their fiduciary duty to act in PrediWave's best interests in representing the corporation, to protect PrediWave, and to fully disclose Qu's wrongful conduct to PrediWave. The alleged damages include the legal fees paid to defendants, the bonuses paid to Qu, the over $40 million taken by Qu who had been "protected . . . from any meaningful internal investigation" by defendants, and "additional unnecessary attorney's fees in excess of US$30 million."

The second cause of action for constructive fraud alleges that defendants had a fiduciary duty to "make full disclosure to PrediWave of all material facts in connection with their representation of PrediWave, Qu, and the Prediwave Companies," including the "conflicts of interest, and all information with respect to Qu's wrongful conduct." This cause of action avers that defendants "abused PrediWave's trust and confidence by reason of the acts

alleged herein." It alleges that defendants failed to "inform PrediWave that a nonwaivable conflict existed between PrediWave and Qu based on the nature of the allegations made against Qu and take steps to insure that PrediWave was represented by separate, independent, and unconflicted counsel" and defendants failed to fully disclose potential and actual conflicts of interest to "the entire Board of PrediWave" and failed to "inform the entire Board of PrediWave of the desirability and necessity of obtaining separate and independent legal advice." According to the second cause of action, defendants' "nondisclosures and breaches of fiduciary duties" caused PrediWave to incur attorney fees.

The third cause of action for malpractice alleges that defendants breached their duties, as set forth in the complaint, to competently represent PrediWave, to act in PrediWave's best interests, to avoid and fully disclose conflicts of interest, to independently investigate Qu, and to fully disclose Qu's wrongful conduct to PrediWave's entire board "so that PrediWave could make an informed decision." It charges defendants with violating the State Bar Rules of Professional Conduct, rules 3-110 (Failing to Act Competently), 3-300 (Avoiding Interests Adverse to a Client), 3-310 (Avoiding the Representation of Adverse Interests), 3-500 (Communication), 3-600 (Organization as Client), 3-700 (Termination of Employment).[5] It avers that, if defendants had competently represented PrediWave, PrediWave would not have incurred millions of dollars in legal fees, Qu would not have been paid bonuses

---

[5] Rules of Professional Conduct, rule 3-310(C), states in part: "A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict . . . ." Rules of Professional Conduct, rule 3-500 states: "A member shall keep a client reasonably informed about significant developments relating to the employment or representation . . . ." Rules of Professional Conduct, rule 3-600, provides in part: "(A) In representing an organization, a member shall conform his or her representation to the concept that the client is the organization itself, acting through its highest authorized officer, employee, body, or constituent overseeing the particular engagement. [¶] (B) If a member acting on behalf of an organization knows that an actual or apparent agent of the organization acts or intends or refuses to act in a manner that is or may be a violation of law reasonably imputable to the organization, or in a manner which is likely to result in substantial injury to the organization, the member shall not violate his or her duty of protecting all confidential information as provided in Business and Professions Code section 6068, subdivision (e). Subject to Business and Professions Code section 6068, subdivision (e), the member may take such actions as appear to the member to be in the best lawful interest of the organization. Such actions may include among others: [¶] (1) Urging reconsideration of the matter while explaining its likely consequences to the organization; or [¶] (2) Referring the matter to the next higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest internal authority that can act on behalf of the organization. [¶] (C) If, despite the member's actions in accordance with paragraph (B), the highest authority that can act on behalf of the organization insists upon action or a refusal to act that is a violation of law and is likely to result in substantial injury to the organization, the member's response is limited to the member's right, and, where appropriate, duty to resign in accordance with rule 3-700. [¶] . . . [¶]

exceeding $25 million, Qu would not have misappropriated over $40 million and transferred funds out of the country, PrediWave would not have sustained a judgment over $2.8 billion, and PrediWave would not have been forced to file for bankruptcy protection.

The fourth cause of action for violation of Business and Professions Code section 17200 et seq. alleges that a conflict of interest resulted from defendant law firm simultaneously representing PrediWave and Qu "in the face of serious allegations that Qu was looting PrediWave." It avers that defendant law firm failed to disclose material information to PrediWave, covered up Qu's fraudulent conduct, and "failed to take reasonable action to protect PrediWave." It alleges that the law firm's failure to disclose its "cover up of Qu's fraudulent conduct, its conflict of interest, [and its] actions and inactions" constitute a fraudulent, deceptive, and unfair business practice.

After the complaint was filed, defendants filed a special motion to strike under the anti-SLAPP statute (§ 425.16), arguing that the causes of action were based upon protected speech and petitioning activity in the underlying lawsuits. They asserted that the complaint seeks to impose liability on defendants for filing pleadings and other motions and their conduct of the litigation. They contended that *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658 [35 Cal.Rptr.3d 31] (*Peregrine*) was directly on point and, as in *Peregrine*, plaintiff's claims were subject to a motion to strike because they arose from protected petitioning activity.

The motion was opposed by declarations and incorporated exhibits. A retainer letter, dated June 10, 2004, confirmed that defendant law firm would represent and advise PrediWave in connection with its legal and business disputes with New World. It also indicated that the "client" included "the associated companies listed on Schedule A ('Associated Companies') and any individual officers, directors or shareholders of these Associated Companies that become named parties in any litigation matters with New World." PrediWave sought to obtain its client files and property from defendant law firm in April 2008. Defendant law firm stated, in an April 25, 2008 letter to PrediWave's current counsel, that the files and property had been transferred to Latham & Watkins between July 1, 2005, and August 12, 2005. Latham & Watkins subsequently delivered those documents to PrediWave's current counsel.

Those documents included, among others, (1) an outline of interview questions for a December 1, 2004 internal interview of Qu, (2) the written

---

(E) A member representing an organization may also represent any of its directors, officers, employees, members, shareholders, or other constituents, subject to the provisions of rule 3-310. . . ."

results of the December 1, 2004 interview, labeled as privileged attorney work product, (3) a March 22, 2005 private investigative report regarding six individuals including Qu, and (4) an April 4, 2005 internal memo to the file, labeled attorney work product, which discusses the relationship between PrediWave and MOT and identifies potential areas of concern, including "apparent inconsistencies between Tony Qu's rendition of events and the documentary record."

Bruce Keiser's declaration states that New World appointed him as a PrediWave director on about July 29, 2004, and, on about April 2, 2008, PrediWave's board of directors appointed him as its chief financial officer and secretary and granted him the "powers and duties of management generally vested in a Chief Executive Officer ('CEO')." According to the declaration, he first became aware of defendant law firm's internal documents, identified above, in about June 2008. He states that neither he nor PrediWave's board was ever notified that defendant law firm had "conducted an internal investigation into MOT revealing Qu's fraud against PrediWave."

The trial court granted the anti-SLAPP motion. It determined that "[t]he claims asserted against defendants are based in significant part upon protected petitioning activities," citing *Peregrine, supra*, 133 Cal.App.4th 658, and that there was "no reasonable probability that plaintiff will . . . prevail" because the claims were time-barred under section 340.6.

B. *Anti-SLAPP Motion*

1. *General Legal Principles*

■ "A SLAPP suit—a strategic lawsuit against public participation—seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1 [81 Cal.Rptr.2d 471, 969 P.2d 564].) The Legislature enacted Code of Civil Procedure section 425.16—known as the anti-SLAPP statute—to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 865 [44 Cal.Rptr.2d 46].)" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055–1056 [39 Cal.Rptr.3d 516, 128 P.3d 713].)

■ Section 425.16, subdivision (b)(1), provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special

motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." "The anti-SLAPP statute, section 425.16, allows a court to strike any cause of action that arises from the defendant's exercise of his or her constitutionally protected rights of free speech or petition for redress of grievances. (§ 425.16, subd. (b)(1).)" (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 311–312 [46 Cal.Rptr.3d 606, 139 P.3d 2].)

"Section 425.16 posits instead a two-step process for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§ 425.16, subd. (b)(1).) 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)' [citation]. If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (§ 425.16, subd. (b)(1); see generally *Equilon* [*Enterprises v. Consumer Cause, Inc.* (2002)] 29 Cal.4th [53,] 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].)" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Id.* at p. 89; see *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278–279 [46 Cal.Rptr.3d 638, 139 P.3d 30].) The court must "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based" in making its determination. (§ 425.16, subd. (b)(2).)

 As statutorily defined in section 425.16, " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).) A moving defendant is not required, however, to prove that a plaintiff brought an action with the intent to chill the defendant's exercise of constitutional speech or petition rights. (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at pp. 57–67; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 74–76 [124 Cal.Rptr.2d 519, 52 P.3d 695].)

■ "[T]he plain language of the 'arising from' prong encompasses any action based on protected speech or petitioning activity *as defined in the statute* (*Navellier v. Sletten*[, *supra*,] 29 Cal.4th 82, 89–95 . . .) . . . ." (*Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th 728, 734, italics added.) "The only means specified in section 425.16 by which a moving defendant can satisfy the requirement is to demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e), defining subdivision (b)'s phrase, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue.' [Citation.]" (*Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th at p. 66.)

■ " 'At least as to acts covered by clauses one and two of section 425.16, subdivision (e), the statute requires simply *any* writing or statement made in, or in connection with an issue under consideration or review by, the specified proceeding or body. Thus these clauses safeguard free speech and petition conduct aimed at advancing self government, as well as conduct aimed at more mundane pursuits. Under the plain terms of the statute it is the context or setting itself that makes the issue a public issue: all that matters is that the First Amendment activity take place in an official proceeding or be made in connection with an issue being reviewed by an official proceeding. . . .' [Citation.]" (*Briggs v. Eden Council for Hope & Opportunity, supra*, 19 Cal.4th at p. 1116.) "Clauses (3) and (4) of section 425.16, subdivision (e), concerning statements made in public fora and 'other conduct' implicating speech or petition rights, include an express 'issue of public interest' limitation; clauses (1) and (2), concerning statements made before or in connection with issues under review by official proceedings, contain no such limitation." (*Id.* at p. 1117; see *id.* at p. 1123.)

■ " '[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute. [Citation.] Moreover, that a cause of action arguably may have been "triggered" by protected activity does not entail that it is one arising from such. [Citation.] In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity.' (*Navellier v. Sletten*[, *supra*,] 29 Cal.4th 82, 89 . . . .)" (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477 [87 Cal.Rptr.3d 275, 198 P.3d 66].)

■ When a pleading contains allegations regarding both protected and unprotected activity, "it is the *principal thrust* or *gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies (*Cotati, supra*, 29 Cal.4th at p. 79) . . . ." (*Martinez v. Metabolife Internat.*,

*Inc.* (2003) 113 Cal.App.4th 181, 188 [6 Cal.Rptr.3d 494].) Incidental allegations regarding protected activity do not "subject the cause of action to the anti-SLAPP statute." (*Ibid.*) "The 'principal thrust or gravamen' test serves the Legislative intent that section 425.16 be broadly interpreted" because a plaintiff cannot "deprive a defendant of anti-SLAPP protection by bringing a complaint based upon both protected and unprotected conduct." (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 319 [86 Cal.Rptr.3d 288, 196 P.3d 1094] [" 'principal thrust or gravamen' " test does not apply under § 425.17, subd. (b), an exception to § 425.16].)

For example, in *Episcopal Church Cases, supra*, 45 Cal.4th 467, the action did *not* arise from protected activity within the meaning of the anti-SLAPP statute where the claim concerned whether the Episcopal Church or St. James Parish, which had disaffiliated itself from the Episcopal Church as the result of a doctrinal dispute, owned certain property. (*Id.* at pp. 473, 475.) Even though "protected activity arguably lurk[ed] in the background of [the] case . . ." (*id.* at p. 473), "the actual dispute concern[ed] property ownership rather than any such protected activity" (*ibid.*) and " 'the gravamen or principal thrust' " of the action was the property dispute in which "both sides claim[ed] ownership of the same property" (*id.* at pp. 477–478).

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.*[, *supra*,] 122 Cal.App.4th 1049, 1056 . . . .) We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [12 Cal.Rptr.3d 786].)" (*Soukup v. Law Offices of Herbert Hafif, supra*, 39 Cal.4th at p. 269, fn. 3.)

2. *"Arising from" Prong*

■ The California Supreme Court has resolved that the anti-SLAPP statute may protect speech and petitioning activities undertaken on another's behalf. In *Briggs v. Eden Council for Hope & Opportunity, supra*, 19 Cal.4th at page 1116, the California Supreme Court rejected the plaintiff landlords' contention that section 425.16 did not protect a nonprofit corporation's tenant counseling activities and "protects only statements or writings that defend the speaker's or writer's own free speech or petition rights or that are otherwise 'vital to allow citizens to make informed decisions within a government office.' " The court concluded that a defendant moving to strike under section

425.16 is not required to demonstrate that "its protected statements or writings were made *on its own behalf* (rather than, for example, on behalf of its clients or the general public)." (19 Cal.App.4th at p. 1116.)

In *Rusheen v. Cohen, supra,* 37 Cal.4th 1048, a defendant in civil litigation filed a cross-complaint against the plaintiff's attorney, alleging abuse of process based upon the attorney's representation of the plaintiff in that case and the attorney's earlier representation of the plaintiff or another client. (*Id.* at pp. 1052–1053.) The attorney successfully brought a special motion to strike the cross-complaint under the anti-SLAPP statute. (*Id.* at p. 1054.) The cross-complainant appealed and, on appeal, the attorney maintained that the trial court had properly granted the anti-SLAPP motion and the abuse of process claim was barred by the litigation privilege (Civ. Code, § 47, subd. (b)). (37 Cal.4th at p. 1055.)

■ As a preliminary matter, the California Supreme Court stated: " 'A cause of action "arising from" defendant's litigation activity may appropriately be the subject of a section 425.16 motion to strike.' (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 648 [49 Cal.Rptr.2d 620], disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.) 'Any act' includes communicative conduct such as the filing, funding, and prosecution of a civil action. (*Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 17–19 [43 Cal.Rptr.2d 350].) This includes qualifying acts committed by attorneys in representing clients in litigation. (See, e.g., *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1086 [114 Cal.Rptr.2d 825]; *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1418–1420 [103 Cal.Rptr.2d 174].)" (*Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1056 [anti-SLAPP motion properly granted because there was no reasonable probability that abuse of process claim would prevail since the allegedly wrongful conduct was privileged].)

We think it significant that the Supreme Court's pronouncements in *Briggs* and *Rusheen* occurred in the context of a third person's cause of action against a person acting on another's behalf. It does not necessarily follow that section 425.16 applies when a client sues a former attorney for acts ostensibly done in furtherance of the client's rights.

In *Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532 [52 Cal.Rptr.3d 712], the plaintiffs retained an attorney "to provide legal services in connection with a dispute arising from property improvements constructed by plaintiffs' neighbors" and later filed a malpractice lawsuit that alleged the attorney " 'failed to exercise reasonable care and skill' while

representing them in the homeowner litigation." (*Id.* at pp. 1535–1536.) The appellate court upheld the denial of the law firm's special motion to strike under the anti-SLAPP statute. (*Id.* at p. 1542.) It reasoned: "A malpractice claim focusing on an attorney's incompetent handling of a previous lawsuit does not have the chilling effect on advocacy found in malicious prosecution, libel, and other claims typically covered by the anti-SLAPP statute. In a malpractice suit, the client is not suing because the attorney petitioned on his or her behalf, but because the attorney did not competently represent the client's interests while doing so. Instead of chilling the petitioning activity, the threat of malpractice encourages the attorney to petition competently and zealously. This is vastly different from a third party suing an attorney for petitioning activity, which clearly could have a chilling effect." (*Id.* at p. 1540.) The appellate court concluded that the defendant law firm had not met its burden under the anti-SLAPP statute's first prong: "[T]his case presents a 'garden variety legal malpractice action.' A legal malpractice action alleges the client's attorney failed to competently represent the client's interests. Legal malpractice is not an activity protected under the anti-SLAPP statute." (*Id.* at p. 1535; see *id.* at p. 1540.)

Other reviewing courts have also concluded that the anti-SLAPP statute did not apply to lawsuits against former attorneys, although their reasoning differs from the analysis in *Kolar.* In *Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 627 [7 Cal.Rptr.3d 715], clients sued their former attorneys for litigation-related malpractice involving the attorneys' failures to protect the clients' rights in a civil lawsuit against them, specifically "(1) a *failure* to serve timely discovery responses, resulting in a waiver of objections pursuant to section 2031, subdivision (*l*); (2) a *failure* to comply with a court order to serve responses without objections; and (3) a *failure* to comply with a second court order." (*Id.* at pp. 627–628, 631.) The appellate court stated: "Respondents' malpractice action is not based upon appellants' having filed an answer or cross-complaint in the action in which appellants represented respondents. It is not, as appellants contend, based upon appellants' having filed declarations, motions, or other papers in that action, or upon appellants' appearance on discovery or other motions. Appellants' characterization of such activity as the basis for respondents' cause of action depends solely upon their narrow construction of the complaint, while ignoring other facts in the record that show what conduct underlies respondents' cause of action." (*Id.* at p. 630.) The court affirmed the denial of the attorneys' special motion to strike after determining that they had not demonstrated that the alleged attorney misconduct constituted constitutionally protected speech or petition and rejected their "attempt to turn garden-variety attorney malpractice into a constitutional right." (*Id.* at pp. 632, 634.)

In *Benasra v. Mitchell Silberberg & Knupp LLP* (2004) 123 Cal.App.4th 1179 [20 Cal.Rptr.3d 621], plaintiffs sued attorneys, who had previously represented them, for breach of the duty of loyalty in subsequently representing a rival in an arbitration proceeding. (*Id.* at pp. 1181–1182.) The trial court granted the defendants' anti-SLAPP motion. (*Id.* at pp. 1182–1183.) The appellate court rejected the argument that plaintiffs' claims were based on written or oral statements made in the arbitration. (*Id.* at p. 1186.) It determined that plaintiffs' claims were "based on rule 3-310(C) of the State Bar Rules of Professional Conduct, which provides that an attorney 'shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or [¶] (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter,' and on rule 3-310(E), which provides that an attorney 'shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.' " (*Id.* at p. 1187.)

The appellate court further determined that, under applicable law, breach of the duty of loyalty "occurs not when the attorney steps into court to represent the new client, but when he or she abandons the old client." (*Benasra v. Mitchell Silberberg & Knupp LLP, supra,* 123 Cal.App.4th at p. 1189.) It reasoned: "[O]nce the attorney accepts a representation in which confidences disclosed by a former client may benefit the new client due to the relationship between the new matter and the old, he or she has breached a duty of loyalty. The breach of fiduciary duty lawsuit may follow litigation pursued against the former client, but does not arise from it. Evidence that confidential information was actually used against the former client in litigation would help support damages, but is not the basis for the claim." (*Ibid.*) The court concluded that the trial court erred in granting the anti-SLAPP motion. (*Ibid.*)

In *Freeman v. Schack* (2007) 154 Cal.App.4th 719, 722 [64 Cal.Rptr.3d 867], "[p]laintiffs sued [Attorney] Schack for breach of contract, professional negligence and breach of fiduciary duty based on allegations that he had entered into a contract by which he assumed attorney-client duties toward plaintiffs but abandoned them in order to represent adverse interests in the same and different litigation, thus breaching the contract as well as the fiduciary duties owed them." Plaintiffs maintained that Attorney Schack violated the State Bar Rules of Professional Conduct providing for the avoidance of representation of adverse interests, specifically rule 3-310(C) and (E). (154 Cal.App.4th at pp. 727–728.)

The appellate court in *Freeman v. Schack* determined that the activity giving rise to Attorney Schack's alleged liability was "his undertaking to represent a party with interests adverse to plaintiffs, in violation of the duty of loyalty he assertedly owed them" and the litigation-related allegations were merely "incidental to the allegations of breach of contract, negligence in failing to properly represent their interests, and breach of fiduciary duty arising from his representation of clients with adverse interests." (*Freeman v. Schack, supra*, 154 Cal.App.4th at p. 732.) The court concluded that the "plaintiffs' causes of action were not based on, and d[id] not arise from, an exercise of the constitutional rights of petition or free speech as enumerated in section 425.16, subdivision (e)." (*Id.* at p. 733.)

In *United States Fire Ins. Co. v. Sheppard, Mullin, Richter & Hampton LLP* (2009) 171 Cal.App.4th 1617 [90 Cal.Rptr.3d 669], United States (U.S) Fire claimed that the defendant law firm had "a disqualifying conflict of interest arising out of Sheppard Mullin's former representation of U.S. Fire" in another matter and sought to enjoin the law firm from representing another party in a pending action in which U.S. Fire was also a party. (*Id.* at pp. 1619–1620.) The appellate court concluded that the complaint did not arise out of protected activity (*id.* at p. 1620); rather, it determined that "the principal thrust of the misconduct averred in the underlying complaint [was] the acceptance by Sheppard Mullin of representation adverse to U.S. Fire" (*id.* at p. 1628). The court explained: " '[O]nce the attorney accepts a representation in which confidences disclosed by a former client may benefit the new client due to the relationship between the new matter and the old, he or she has breached a duty of loyalty. The breach of fiduciary duty lawsuit may follow litigation pursued against the former client, but does not arise from it. Evidence that confidential information was actually used against the former client in litigation would help support damages, but is not the basis for the claim.' " (*Id.* at p. 1627.)

In contrast to the foregoing cases, the appellate court in *Peregrine* determined that causes of action against a law firm were subject to the anti-SLAPP statute. The *Peregrine* case involved investors who had lost millions of dollars in a large Ponzi scheme carried out by PinnFund USA, Inc. (PinnFund), a company that was established by James Hillman and another person and that was "disguised as a successful mortgage lending business." (*Peregrine, supra*, 133 Cal.App.4th at pp. 665–666.) One of the plaintiffs was "a bankruptcy trustee representing entities that were used to perpetrate the scheme" (*id.* at p. 665). The entities under bankruptcy protection included three businesses created by Hillman to solicit funds for investment in PinnFund mortgages (funding entities) and Peregrine Funding, Inc. (Peregrine), which managed the funding entities and which was controlled by Hillman and his wife. (*Id.* at pp. 665–666, 668, fn. 4, 688.) Other plaintiffs were investors "asserting claims on behalf of themselves and a putative class of bilked investors." (*Id.* at

p. 668, fn. 4.) The plaintiffs "sued the law firm Sheppard Mullin Richter & Hampton LLP (Sheppard), claiming its negligence and affirmative misconduct helped the perpetrators of the scheme avoid detection and prosecution by securities regulators." (*Id.* at p. 665.)

In *Peregrine*, the law firm, which represented Hillman, Peregrine, and the funding entities, failed to cooperate with an SEC (Securities and Exchange Commission) investigation during February and March 2001 and the SEC filed a lawsuit on March 21, 2001. (*Peregrine, supra*, 133 Cal.App.4th at pp. 666–667.) On April 2, 2001, the law firm gave notice it was withdrawing as counsel for the funding entities but it continued to represent Hillman "through the duration of the SEC action." (*Id.* at p. 667.)

The plaintiffs in *Peregrine* asserted two causes of action, one for legal malpractice and another for aiding and abetting a breach of fiduciary duty. (*Peregrine, supra*, 133 Cal.App.4th at p. 668.) Their claims were based on transactional legal advice, set forth in letters, given to Hillman that Peregrine and the then existing funding entities were not required to register under applicable law and the law firm's "allegedly conflicted representation of adverse parties in the 2001 SEC action" alleging violation of federal securities laws. (*Ibid.*) The complaint alleged that the law firm, before it withdrew as counsel for the funding entities, "continued to represent the Funding Entities and Peregrine but acted to their detriment in serving the needs of its coclient Hillman," by opposing provisional relief sought by the government, fighting appointment of a receiver, and by threatening to put the funding entities into bankruptcy if the government insisted that Hillman testify. (*Id.* at p. 667.) "Plaintiffs also claim[ed] they were damaged by [the law firm's] representation of Hillman in the SEC action in that the firm: (1) blocked the SEC's investigation and delayed provisional relief; and (2) assisted Hillman's exit from the Ponzi scheme by helping him implement a so-called dividend reinvestment program that recycled investor returns instead of distributing them to investors." (*Id.* at p. 668.)

The appellate court first determined that the legal opinion letters, which were not issued in connection to any litigation, were "*not* writings made before a judicial proceeding, or in connection with an issue under review by a court. (§ 425.16, subd. (e)(1), (2).)" (*Peregrine, supra*, 133 Cal.App.4th at p. 670, italics added.) It also agreed that some of the law firm's challenged conduct did not involve speech or petitioning activities, such as the law firm's failure "to disclose potential conflicts of interest or obtain informed consent from all clients to its joint representation . . . ." (*Id.* at p. 671.) But the appellate court found the law firm's opposition to "the SEC's efforts to obtain restraining orders and to appoint a receiver" in a lawsuit "necessarily involved 'written or oral statement[s] . . . made before a . . . judicial

proceeding' (§ 425.16, subd. (e)(1))" and the law firm's alleged litigation tactics, which included noncommunicative conduct such as stopping deposition testimony and withholding documents, "constitute[d] 'conduct in furtherance of the exercise of the constitutional right of petition' (§ 425.16, subd. (e)(4)) . . . ." (*Id.* at pp. 671–672.)

The appellate court in *Peregrine, supra*, 133 Cal.App.4th 658 determined that the "allegations of loss resulting from protected activity distinguish[ed] [the] case from other cases finding certain claims against lawyers were not subject to a motion to strike under section 425.16." (*Id.* at p. 673.) Although it acknowledged that "the overarching thrust of plaintiffs' claims" was that the law firm's conduct facilitated the Ponzi scheme, it also observed that "some of the specific conduct complained of involve[d] positions the firm took in court, or in anticipation of litigation with the SEC" and the plaintiffs claimed damages due to the law firm's "conduct in delaying resolution of the SEC investigation and lawsuit and its legal strategies opposing early provisional relief." (*Ibid.*) The *Peregrine* court concluded that the plaintiffs' claims were "based in significant part" on the law firm's "protected petitioning activity in the SEC litigation" and the allegations of petitioning activity were not merely incidental. (*Id.* at pp. 673, 675.)

Defendants in this case urge us to follow the *Peregrine* case, maintaining that the complaint alleges they "breached their duties by initiating a lawsuit, filing motions, taking an appeal, stonewalling discovery, and engaging in other protected litigation activity." They further argue that the complaint seeks to "impose damages for litigation activities undertaken in the course of an allegedly conflicted representation" and indicates that "the litigation acts were themselves wrongful and caused damages."

First, to the extent that *Peregrine* might be read as *not* requiring a public issue connection with regard to litigation-related conduct (as opposed to statements or writings), such as conduct pursuant to a general litigation strategy (see *Peregrine, supra*, 133 Cal.App.4th at p. 672), we disagree with it. We observe that only one of the four categories of protected activity covers conduct (§ 425.16, subd. (e)(4) ["conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech"]) and that type of protected activity must have taken place "in connection with a public issue or an issue of public interest" (*ibid.*; see *Briggs v. Eden Council for Hope & Opportunity, supra*, 19 Cal.4th at pp. 1117, 1123).

In this case, the principal thrust of PrediWave's causes of action is that defendants simultaneously represented both PrediWave and Qu in matters in

which they had an irreconcilable conflict of interest. This conflict of interest allegedly adversely affected defendants' choice of legal strategy and caused defendants to aggressively oppose and stonewall New World and its two outside directors on PrediWave's board in PrediWave's disputes with them and resulted in defendants' repeated failures to take action to safeguard PrediWave against Qu's misconduct. Those multiple failures allegedly included, among others, failing to investigate Qu's conduct, failing to provide to PrediWave's board of directors material information or advice regarding Qu's conduct and regarding the apparent or actual conflict of interest in representing both PrediWave and Qu, and failing to take affirmative action to prevent Qu's self-dealing and the associated financial losses to PrediWave. Clearly, defendants' continuation of joint representation, their legal strategy and implementing noncommunicative conduct, and their alleged failures to act are not statements or writings within the meaning of section 425.16, subdivision (e). There was no showing that any of defendants' allegedly wrongful conduct, not consisting of statements or writings, occurred "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

Even assuming, as defendants assert, PrediWave is seeking to hold them "liable in damages for litigation activities they allegedly performed on PrediWave's behalf," this does not necessarily make PrediWave's causes of action subject to the anti-SLAPP statute. Although defendants impliedly engaged in speaking and writing in connection with the L.A. and Santa Clara actions and the mandate proceeding, defendants engaged in those activities as plaintiff PrediWave's legal representative. As previously discussed, clients do not bring such lawsuits to deter the speech and petitioning activities done by their own attorneys on their behalf but rather to complain about the quality of their former attorneys' performance. (See *Kolar v. Donahue, McIntosh & Hammerton, supra*, 145 Cal.App.4th at p. 1540; § 425.16, subd. (a).)

In determining the applicability of the anti-SLAPP statute, we think a distinction must be drawn between (1) clients' causes of action against attorneys based upon the attorneys' acts on behalf of those clients, (2) clients' causes of action against attorneys based upon statements or conduct solely on behalf of different clients, and (3) nonclients' causes of action against attorneys. In the first class, the alleged speech and petitioning activity was carried out by attorneys on behalf of the plaintiffs in the lawsuits now being attacked as SLAPP's, although the attorneys may have allegedly acted incompetently or in violation of the Professional Rules of Conduct. The causes of action in this first class categorically are not being brought "primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition . . . ." (§ 425.16, subd. (a).)

■ We recognize that the statute makes "[a] cause of action against a person arising from *any act of that person in furtherance of the person's* [constitutional] right of petition or free speech . . . in connection with a public issue . . . subject to a special motion to strike" (§ 425.16, subd. (b)(1), italics added). Although this statutory language has been interpreted broadly to protect qualifying statements made or conduct undertaken by a person on another person's behalf against a cause of action by a third person (see *Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1056; see also *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1116), it is unreasonable to interpret this language to include a client's causes of action against the client's own attorney arising from litigation-related activities undertaken for that client. "The cardinal rule of statutory construction is to ascertain and give effect to the intent of the Legislature. (*Steketee* v. *Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 51 [210 Cal.Rptr. 781, 694 P.2d 1153].)" (*Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 819 [226 Cal.Rptr. 81, 718 P.2d 68].) Although a broad interpretation of the anti-SLAPP statute is statutorily mandated (see § 425.16, subd. (a)), an overly broad interpretation of section 425.16, subdivision (b), that includes such client lawsuits unreasonably expands the language beyond the clear legislative purpose and leads to absurd results. ■ (See *Younger v. Superior Court* (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014] [" ' "It is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' "].) Consequently, we disagree with *Peregrine* to the extent it indicates that the anti-SLAPP statute applies to clients' causes of action against their former attorneys based upon the attorneys' statements made or conduct undertaken in representing the clients.

■ It is our conclusion that defendants did not satisfy their threshold burden of demonstrating that the principal thrust of any of the complaint's causes of action was activity protected by the anti-SLAPP statute. The trial court erred in determining that this was a SLAPP suit subject to a special motion to dismiss pursuant to section 425.16.

## 3. *Probability of Success*

Since defendants did not make the requisite threshold showing, plaintiff PrediWave was not required to establish a probability of prevailing on the merits of its claims and we need not reach that issue. Our conclusions do not reflect any evaluation of the merits of PrediWave's present lawsuit.

The order granting the special motion to strike the complaint is reversed. Costs on appeal are awarded to appellant.

Rushing, P. J., and Premo, J., concurred.