[No. A132580. First Dist., Div. Two. May 30, 2012.]

ANNE W. THAYER, Plaintiff and Respondent, v.
KABATECK BROWN KELLNER LLP et al., Defendants and Appellants.

**COUNSEL**

Buchalter Nemer, Harry W.R. Chamberlain II and Robert M. Dato for Defendants and Appellants.

Ernest M. Thayer for Plaintiff and Respondent.

**OPINION**

**RICHMAN, J.**—Plaintiff sued attorneys who handled a class action in Los Angeles, based on the attorneys' handling of the settlement proceeds in that action—an action in which plaintiff was not a party. Defendants filed an anti-SLAPP motion to strike the complaint, asserting that plaintiff's lawsuit dealt with protected activity and that she could not demonstrate a likelihood of prevailing on the merits. The trial court denied the motion under the first step of the anti-SLAPP analysis, and did not reach step two.

Defendants appeal, and we review the matter de novo, concluding first that plaintiff's lawsuit arose out of protected activity. And we go on to decide step two, and hold that plaintiff has failed to demonstrate a likelihood of prevailing on the merits. We thus reverse, with instructions to enter an order

granting the motion to strike, and to hold a hearing to determine the amount of attorney fees to which defendants are entitled for their success in having the lawsuit stricken.

## BACKGROUND

*The Parties*

According to the allegations of her verified complaint, plaintiff-respondent Anne W. Thayer (Thayer) and "her spouse" were "co-owners of a resort membership." Thayer's spouse, the alleged "co-owner," is Ernest M. Thayer (Mr. Thayer). Mr. Thayer is a very experienced attorney, who was admitted to the California State Bar in 1961. And, his declaration would support, Mr. Thayer is apparently quite successful, as "in [his] last year of working as an attorney full-time, [he] earned approximately $3 million." Mr. Thayer represented his wife below, and represents her on appeal.

Defendants-appellants are Kabateck Brown Kellner LLP, a Los Angeles law firm, and Richard Kellner, a member of the firm (for convenience, usually referred to collectively as Kabateck). Kabateck (along with another firm whose identity is not pertinent here) filed a class action litigation in Los Angeles involving "resort memberships," litigation referred to below as the "Abercrombie & Kent litigation."

*The Abercrombie & Kent Litigation*

In 2007, Kabateck entered into letter agreements with "members" of luxury destination clubs to provide legal services. The letter agreement provided that it was "between attorneys and client," and was for this purpose: "2. **SERVICES TO BE PROVIDED**. The legal services to be provided by Attorneys to Client are as follows: Consultation and advice to Client including representation for claims in a series of mass action lawsuits (the 'Case') to be brought against Abercrombie & Kent, Inc., Geoffrey Kent, Andrew Harper Travel, Inc., Intrawest Corporation, Fortress Investment Group and related individuals and entities ('Defendant') pertaining to the fraudulent sale of the resort memberships."

On August 14, 2007, Mr. Thayer signed such a letter agreement, and that same day he signed a "Joint Prosecution Agreement." No such agreements were ever signed by Thayer.

As to the origin of the Joint Prosecution Agreement, the prospective plaintiffs for the "mass action" came through a "steering committee" made up of several individual plaintiffs appointed by the larger group of prospective plaintiffs, which committee was to seek out and retain the best counsel available to represent the group. As part of the process to have the steering committee represent their interests, each client signed a separate agreement with the steering committee, providing it with full authority to make all litigation-related decisions, including settlement.

In January 2008, the class action lawsuit was filed in Los Angeles Superior Court. It named as defendants Abercrombie & Kent and related entities and individuals, and alleged fraud in connection with the sale of memberships in luxury destination clubs.

In October 2010, the steering committee agreed to settle the litigation for some $53,170,000. The settlement was approved by the Honorable Peter Lichtman, who ordered that he would retain jurisdiction over the matter to enforce the terms and conditions of the settlement agreement if necessary.

Kabateck prepared and delivered to all plaintiffs a memorandum explaining the basis for the settlement and the distribution method of the settlement proceeds. Shortly thereafter, Kabateck sent an "FAQ" to all plaintiffs, including Mr. Thayer, explaining the distribution and allocation of the settlement proceeds as established by the special master appointed by the steering committee. The "FAQ" also explained how a plaintiff could appeal an allocation determined by the special master.

On January 14, 2011, Mr. Thayer signed a general release in consideration of the settlement of the Abercrombie & Kent litigation. The release provides that it is signed "on my own behalf and on behalf of my spouse, agents, representatives, heirs, assigns and any entity . . . ." Mr. Thayer also signed a "Disbursement Authorization" of the settlement proceeds for his portion.

While Mr. Thayer was signing those documents in January 2011, he did so having already filed the lawsuit involved here.

*The Subject Lawsuit*

On December 21, 2010, Mr. Thayer filed a complaint naming as plaintiff "Thayer, on behalf of herself and all others similarly situated." The complaint

was verified by Thayer, and it named six defendants, including, as pertinent here, Kabateck and Kellner. It purported to allege eight causes of action, styled as follows: (1) commission of fraud and deceit; (2) tortious interference with protected property interest; (3) violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.); (4) violation of Business and Professions Code section 17500; (5) violation of Business and Professions Code section 17200; (6) declaratory relief; (7) conversion; and (8) breach of trust. With two exceptions,[1] all causes of action are essentially based on the so-called "General Allegations" in the first 25 paragraphs. We thus focus on the essential charging allegations in those paragraphs, which include the following:

"2. Thayer and her spouse are co-owners of a resort membership. On August 14, 2007, Thayer's spouse entered into a written contract with Kabateck . . . concerning that membership. . . . Thayer's spouse entered into a written contract with Steering Committee . . . concerning that membership. . . .

"3. Defendants entered into identical written contracts with more than 500 other owners of resort memberships.

"4. Thayer's spouse and defendants intended their contracts . . . to affect Thayer, and she is a third-party beneficiary of those contracts.

"5. Each of those contracts requires defendants to prosecute group or mass actions on behalf of the above mentioned owners, excluding Thayer but including her spouse, against the same named entities 'and related individuals and entities . . . pertaining to the fraudulent sale [to those owners] of the resort memberships.'

"6. Defendants prosecuted actions on behalf of Thayer's spouse and the other owners, excluding Thayer, pertaining to the fraudulent sale to them of their resort memberships. Defendants prosecuted those actions against some, but not all, of the entities that are named in the contracts . . . as being entities against which defendants would bring suit. Defendants also prosecuted those actions against other entities that are not so named in the contracts. . . . Thus, defendants [sic] representation of their clients required them to exclude from

---

[1] The two exceptions are the first cause of action, for fraud, which alleges falsity in the letter agreement and Joint Prosecution Agreement, and the seventh cause of action, for conversion, which essentially asserts that defendants converted money allegedly owed to "Thayer's spouse."

the lawsuits entities named in the contracts that had no liability, and to include in the lawsuits entities not named in the contracts that nevertheless might have liability.

"7. Thayer's spouse called to defendants' attention an entity, Rob McGrath, who had probable liability and whom defendants had not named. Defendants replied that their contracts 'specifically limited' them to suing only the entities named in the contracts as proposed defendants, that they had not sued McGrath, and that they did not know whether or not an action against McGrath would be time-barred.

"8. Defendants' contracts provided that Thayer's spouse and the other owners would have the right to make 'substantive decisions in the handling' of these actions. However, defendants gave Thayer's spouse no opportunity to do so. Defendants settled the action as to those entities that were named therein as defendants, and notified Thayer's spouse of the amount recovered, and of the amounts that defendants would deduct from that recovery for attorneys' fees and costs. Thayer's spouse called to defendants' attention, in writing, an error in the computation of costs, but defendants made no response."

The complaint then goes on to allege that "Thayer's spouse" asked for a breakdown of the disbursements, and then alleges this:

"10. Following defendant's collection of the proceeds of the settlement, . . . [d]efendants have prepared and sent to each owner for signature and return, a 'Disbursement Authorization' dated November 19, 2010. . . . According to that document, defendants have volunteered to donate a portion of each owner's share of those proceeds to a 'Fraud Fund.' Defendant Steering Committee previously had provided a 'Confidential Memorandum' dated October 29 concerning, among other things, this 'Fraud Fund.' Thayer's spouse has not agreed to any requirement of confidentiality concerning this memorandum. . . .

"11. A substantial portion of the 521 owners who, according to defendants, 'are participating in the Fraud Fund,' are doing so only because of defendants' obscuration. Defendants' announcements of (1) the existence of this fund, (2) the way in which to avoid assessment therefor, and (3) the deadline for doing so, are buried in non-emphasized type at pages 4 and 5 of the abovementioned 'Confidential Memorandum.' . . .

"12. When Thayer's spouse asked defendants for a breakdown of the costs that they have designed the 'Fraud Fund' to cover, defendants replied that 'we as your attorneys have no oversight, interest or control over the Fraud

Fund.'[2] However, the contracts require defendants to collect and disburse the proceeds of any recovery. . . .

"13. Thayer's spouse also asked defendants, in writing, for lists of those owners that have opted out of making a contribution to the 'Fraud Fund,' and that have not approved the settlement. Defendants have ignored both of those requests.

---

[2] Kellner filed a declaration below in which he explained in detail the referred-to "Fraud Fund":

"3. In the opposition, attorney Ernest Thayer submitted a declaration in which he makes reference to a 'fraud fund' which he claims caused *him* harm, despite his execution and agreement to the settlement documents.

"4. To clarify what *Mr. Thayer* is complaining about, a little explanation is required regarding the 'fraud fund.' The litigation in which my firm represented Mr. Thayer was part of a collective case litigated on behalf of over 500 individuals, each of whom signed an agreement in which they delegated to a 'Steering Committee' all litigation decisions (including settlement) so that the case could be efficiently and effectively litigated. Mr. Thayer does not contest this fact, nor object to it, since he is an attorney who executed this written agreement.

"5. At the conclusion of the action, members of the 'Steering Committee' suggested that a 'fraud fund' be set up to potentially assist in the criminal prosecution against Robert McGrath—the mastermind behind the fraud that resulted in the civil settlement of $53,170,000 paid by other defendants. The existence of this fraud fund was fully disclosed to all the plaintiffs and was entirely voluntary.

"6. On November 19, 2010, Mr. Thayer and the other plaintiffs received a cover letter containing, among other things, a disbursement authorization sheet and a Frequently Asked Questions document. . . .

"7. Specifically, in the Frequently Asked Questions document, Plaintiff was specifically advised that if he did not opt out of the fraud fund when he signed the disbursement, he would be so included. Significantly, even the disbursement authorization contained a box which provided the clients (including Mr. Thayer) with explicit instructions on how to be excluded from the fraud fund.

"8. Indeed, Mr. Thayer affirmatively opted out of the 'fraud fund' by checking the box—as did approximately 1/3 of the represented parties who appeared in the case. . . .

"9. The box that Mr. Thayer checked [is] replicated below:

> ☐ I have opted-out of Fraud Fund and do not wish to contribute to the Fraud Fund. Please do not deduct my contribution to the Fraud Fund from my net recovery.

"10. Moreover, the Disbursement Authorization for each client—including Mr. Thayer—specifically set forth the amount of money that would be contributed to the Fraud Fund if they did not check the box. . . .

"11. Every client who received disbursement was provided with the same documents that were provided to Mr. Thayer, and the only individuals who made payments to the Fraud Fund were those who did not check the box requesting the monies to be provided to the Fraud Fund.

"12. Not one client has complained about this process (other than Mr. Thayer), and Mr. Thayer is the only one who instigated a lawsuit on behalf of his wife.

"13. This is all the more interesting because Mr. Thayer signed a full release and was fully advised about the Fraud Fund in the Disbursement Authorization, which he signed. Indeed, the general release was signed on behalf of him and his spouse. . . ."

"14. Defendants refuse to disburse to Thayer's spouse his share of the recovery until he has signed and returned to them a 'General Release' and the abovementioned 'Disbursement Authorization,' both of which defendants have prepared. . . ."[3]

Thayer's complaint, therefore, is essentially premised on the following theory: Kabateck settled the Abercrombie & Kent litigation for just over $53 million and held the settlement funds in trust; pursuant to a decision of the steering committee, Kabateck notified its clients that, unless they affirmatively opted out of a "Fraud Fund" to be used in a related criminal prosecution, Kabateck would deduct 2.5 percent from the clients'. net recoveries; and Kabateck told Mr. Thayer that his notification was late and therefore deducted 2.5 percent of his settlement proceeds, or $1,216.21. And, of course, all claimed interactions with Kabateck were with "Thayer's spouse"—not Thayer.

*The Anti-SLAPP Motion*

On February 23, 2011, Kabateck filed a special motion to strike the complaint under Code of Civil Procedure section 425.16[4] (SLAPP or anti-SLAPP). Though simple and straightforward, the motion cited 32 cases, most of which were cited in support of Kabateck's argument that Thayer's "lawsuit arises from the lawyers' constitutionally protected . . . speech and . . . activity on behalf of their clients in the Abercrombie & Kent litigation." The papers filed with the anti-SLAPP motion included declarations of two attorneys, Kellner, and Harry W.R. Chamberlain, counsel for Kabateck in this case. Kabateck's papers also included a request for judicial notice of six documents filed in various California courts:

1. Complaint in the Abercrombie & Kent litigation, filed in Superior Court of Los Angeles, case No. BC374913 (*Hirschmann v. Abercrombie & Kent Inc.*).

2. Minute orders in the Abercrombie & Kent litigation assigning all related cases to Judge Ronald M. Sohigian in department 41 of the Superior Court of Los Angeles.

3. Order consolidating all related cases in Abercrombie & Kent litigation.

---

[3] In a declaration filed in opposition to the anti-SLAPP motion, Thayer admitted that Kabateck honored his opt-out request and "remitted to me the net recovery without a deduction for the 'Fraud Fund.' "

[4] All subsequent statutory references are to the Code of Civil Procedure except as otherwise stated.

4. Transcript of mandatory settlement conference proceedings before Judge Lichtman in the Abercrombie & Kent litigation.

5. Complaint in *Thayer v. Benjamin Franklin Plumbing, Inc.* (Super. Ct. S.F. City and County, 2009, No. CGC-90-486492).

6. Order dismissing defendants in *Thayer v. Benjamin Franklin Plumbing, Inc.* (Super. Ct. S.F. City and County, 2009, No. CGC-90-486492).

The request for judicial notice attached what were referred to as "true and correct" copies of the documents.

On March 11, 2011, Thayer filed her "Opposition to [Kabateck's] Three Motions, One Request for Judicial Notice, and Two Requests for Attorneys Fees & Costs." That opposition was a total of nine pages in length, and included opposition to two other motions in addition to the anti-SLAPP, those (1) to change venue and (2) to strike punitive damages from the complaint.

Thayer's brief opposition to the anti-SLAPP motion argued essentially three things: (1) that Kabateck has "not proven that they ever sought to exercise their political or legal rights"; (2) that Thayer's suit is a class action and therefore exempt from the anti-SLAPP statute; and (3) that a breach of the settlement agreement is not "an exercise of right of petition or free speech." Thayer's opposition went on to argue that there is a "probability of [Thayer's] success in this action," an argument that was all of 13 lines.

On March 17, Kabateck filed a reply memorandum, accompanied by another declaration from Kellner.

### The Ruling on the SLAPP Motion

The SLAPP motion was originally set to be heard on March 24, 2011. It apparently did not come on for hearing that day and, as there is no register of actions or transcript of any hearing, we do not know precisely what did occur. What we glean from the record is that a "Notice of Taking Matters Under Submission and Schedule to File Supplemental Briefs" was filed on May 2 (signed Apr. 29), which provided in pertinent part as follows: "After reading the tentative rulings into the record concerning defendants Kabateck Brown Kellner et al.'s special motion to strike under Code of Civil Procedure section 425.16, motion to strike punitive damages allegations, and motion for change of venue, the court ordered as follows": Kabateck may have until May 2 to file their supplemental brief, Thayer until May 6.

The tentative ruling is likewise not in the record, so we do not know what it ruled. What we do have is Kabateck's supplemental brief which begins as follows:

"1. This Court Should Address the Merits of the Anti-SLAPP Motion.

"The tentative states: '[I]t is clear that the timing of this motion deprives plaintiff of an opportunity to amend her complaint per the Court's previous rulings on the defendant's demurrer.' " Kabateck's supplemental brief goes on to argue why a "potential amended complaint is irrelevant to a pending anti-SLAPP motion."

Thayer submitted her supplemental brief on May 6.[5]

Two months later, on July 5, the trial court entered what it called "Orders on the Motions of Defendants to Strike and to Change Venue." It was seven lines long and provided in its entirety as follows: "Defendants' special motion to strike is denied. The activity that constitutes plaintiff's claim in the complaint does not constitute protected litigation related speech and petitioning activity. *Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 630–632 [7 Cal.Rptr.3d 715]. [¶] Because the issue regarding the disbursement of settlement funds was mooted by plaintiff's husband's signing of the release after the complaint was filed, there is no longer a basis for a change of venue to Los Angeles. Accordingly, the change of venue motion is denied."

Kabateck filed a timely notice of appeal.

## DISCUSSION

### SLAPP Law and the Standard of Review

Subdivision (b)(1) of section 425.16 provides that "[a] cause of action against a person arising from any act of that person in furtherance of the

---

[5] Thayer's description of what occurred says this: "On April 27, 2011, pursuant to Rule 3.1308(a)(1) of the California Rules of Court and to Local Rule 8.3, the court issued its tentative ruling on three motions by defendants . . . . In those rulings the court denied those defendants' motions for orders (1) striking the complaint . . . . The court did not specify that a hearing was required, and no party gave notice of intent to appear. Rule 3.1308[(a)](1). Hence, each party forfeited the right to oral argument in return for Rule 3.1308(a)(1)'s provision that in the absence of such direction or notice, '[t]he tentative ruling will become the ruling of the court.' Local Rule 8.3 E dictates the same result.

"On April 29, defendants gave notice that on April 28 '[t]he matter was taken under submission.' [Citation.] Curiously, defendants, in that same notice, stated that the court had ordered *post*-submission briefs. Defendants have not explained who, if anyone, appeared on April 28, or how this order was transmitted to them without plaintiff's having been afford[ed] the opportunity to oppose it, both procedurally and calendar-wise. Rule 3.1308(a)(1) requires the court to confirm its tentative ruling, and this is particularly so in view of plaintiff's having relied upon that rule in foregoing her right to oral argument. Despite the above, plaintiff submits the following . . . ."

person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Subdivision (e) elaborates the four types of acts within the ambit of a SLAPP, including, as pertinent here, "(2) any . . . statement or writing made in connection with an issue under consideration . . . by a . . . judicial body, or any other official proceeding authorized by law."

■ A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendants have made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fits one of the categories spelled out in subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].)

"The Legislature enacted section 425.16 to prevent and deter 'lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete 'the defendant's energy' and drain 'his or her resources' [citation], the Legislature sought "to prevent SLAPPs by ending them early and without great cost to the SLAPP target" ' [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems Inc. v. Delfino* (2005) 35 Cal.4th 180, 192 [25 Cal.Rptr.3d 298, 106 P.3d 958].)

Finally, and as subdivision (a) of section 425.16 expressly mandates, the section "shall be construed broadly."

With these principles in mind, we turn to a review of the issues before us, a review that is de novo. (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 988 [119 Cal.Rptr.3d 835] (*Grewal*).)

*Thayer's Lawsuit Is Within the SLAPP Statute*

■ As noted, the SLAPP statute is to be "construed broadly." Doing so, we look for "the principal thrust or gravamen of the plaintiff's cause of action." (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 [6 Cal.Rptr.3d 494], italics omitted.) The "critical consideration" is what

the cause of action is "based on." (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 89, italics omitted.) Thayer's action is "based on" Kabateck's conduct in the Abercrombie & Kent litigation. This activity, we conclude, is protected under the SLAPP statute.

■ Numerous cases have held that the SLAPP statute protects lawyers sued for litigation-related speech and activity. (See *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 [39 Cal.Rptr.3d 516, 128 P.3d 713]; *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 742–743 [3 Cal.Rptr.3d 636, 74 P.3d 737]; *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 479–480 [99 Cal.Rptr.3d 394]; *Mindys Cosmetics, Inc. v. Dakar* (9th Cir. 2010) 611 F.3d 590, 596.) Put otherwise, legal advice and settlement made in connection with litigation are within section 425.16, and may protect defendant attorneys from suits brought by third parties on any legal theory or cause of action "arising from" those protected activities. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1194–1195 [17 Cal.Rptr.2d 828, 847 P.2d 1044] [pursuing litigation and settling a client's claims are acts in furtherance of protected activity]; *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 908 [120 Cal.Rptr.2d 576].)

The Court of Appeal gave examples of all this in *Kashian v. Harriman, supra*, 98 Cal.App.4th at page 908: "Several other decisions likewise have adopted a fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16. The defendant in *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777 [54 Cal.Rptr.2d 830], an action for defamation, was a law firm conducting an investigation in anticipation of filing a complaint with the Attorney General. *Church of Scientology v. Wollersheim* [(1996)] 42 Cal.App.4th 628 [49 Cal.Rptr.2d 620] involved an action to set aside a court judgment the defendant had received in a prior lawsuit. And *Wilcox v. Superior Court* [(1994)] 27 Cal.App.4th 809 [33 Cal.Rptr.2d 446], a suit for defamation and restraint of trade, concerned statements made by the defendant in exhorting others to contribute to the cost of proposed litigation. In each case, the court held the statute applied."

The Supreme Court also confirmed much of this, in *Rusheen v. Cohen, supra*, 37 Cal.4th at page 1056: " 'A cause of action "arising from" defendant's litigation activity may appropriately be the subject of a section 425.16 [special] motion to strike.' [Citation.] 'Any act' includes communicative conduct such as the filing, funding, and prosecution of a civil action. (*Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 17–19 [43 Cal.Rptr.2d 350].) This includes qualifying acts committed by attorneys in representing clients in litigation. (See, e.g., *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1086 [114 Cal.Rptr.2d 825]; *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1418–1420 [103 Cal.Rptr.2d 174].)"

Thayer's claims here "arise from" Kabateck's constitutionally protected activity undertaken on behalf of the *actual clients* represented in the Abercrombie & Kent litigation. They are within the SLAPP statute.

Arguing to the contrary, Thayer makes four arguments, the first consisting of several pages, with the other three being particularly brief, consisting of no more than two paragraphs. The first argument asserts that Kabateck "did not prove" that the complaint could be read to come within section 425.16 based on the Abercrombie & Kent litigation because Kabateck "never proved" that litigation. In Thayer's words, Kabateck "adduced no admissible evidence that 'the Abercrombie & Kent litigation' ever had existed. [¶] [Kabateck] allegedly described that litigation and its supposed settlement in great detail in their memorandum. [Citation.] But not once in either of their 'supporting' declarations did they authenticate any document therefrom. And although they requested the trial court to take judicial notice of four documents which they claimed to have been from 'the Abercrombie & Kent litigation' [citation], none was either sworn to or certified. *United States v. Dibble* (9th Cir. 1970) 429 F.2d 598, 602. And although [Thayer] relied upon *Dibble,* both in the trial court [citation] and in this court in her successful opposition to defendants' writ petition (No. A132739), [Kabateck] makes no mention thereof in their opening brief." We are nonplussed.

As quoted above, Thayer's verified *complaint* discussed the Abercrombie & Kent litigation at great length. Indeed, the exhibits attached to the complaint included two exhibits—the engagement letter and joint protection agreement—signed by Mr. Thayer. The exhibits had this reference: "re: Abercrombie & Kent et al. Litigation."

The statute provides that in ruling on a SLAPP motion, "the court shall consider the pleadings, and [the] supporting and opposing affidavits stating the facts upon which the liability . . . is based." (§ 425.16, subd. (b)(2).) As the leading practical treatise puts it, this portion of the anti-SLAPP "should be interpreted to allow the court to consider the 'pleadings' in *determining the nature of the 'cause of action.'* " (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2011) ¶ 7:1021.1, p. 7(11)-48 (rev. # 1, 2011).)

Thayer's reference to *Dibble* is equally misplaced. Relying on it, Thayer argues that the documents attached to Kabateck's request for judicial notice were not "sworn or certified" and, so the argument runs, there is no evidence that the Abercrombie & Kent litigation ever existed.

The documents were attached to a request for judicial notice, not an affidavit, as was the case in *Dibble.* And a request for judicial notice allows

parties to introduce records of any court of the State of California. (Evid. Code, § 452, subd. (d).) There is no requirement that those records be sworn or certified before a court can take judicial notice of the documents. (See Evid. Code, §§ 450–460.)

In sum and in short, Thayer's complaint clearly involves things that happened in the Abercrombie & Kent litigation—a litigation, not incidentally, to which she was not even a party.

Thayer's next argument is that her "Suit Is a Putative Class Action, and Therefore Exempt From The Special Motion To Strike Of CCP Section 425.16." Thayer is wrong, as shown, for example, by a recent case from our colleagues in Division One: *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664 [105 Cal.Rptr.3d 98]. There, the Court of Appeal reversed a trial court's denial of an anti-SLAPP motion brought by the publishers of Rolling Stone magazine, ordering stricken the complaint in a "class action" brought on behalf of a putative "class" of independent music performers. (*Id.* at pp. 670–671; see *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1246 [49 Cal.Rptr.3d 861].)

■ The two cases cited by Thayer—*Goldstein v. Ralphs Grocery Co.* (2004) 122 Cal.App.4th 229 [19 Cal.Rptr.3d 292] and *Northern Cal. Carpenters Regional Council v. Warmington Hercules Associates* (2004) 124 Cal.App.4th 296 [20 Cal.Rptr.3d 918]—are easily distinguishable. Those cases are premised on the "exemption" in section 425.17, and apply only to actions brought solely in the public interest or on behalf of the general public. And the exemption pertains only if the case meets certain specified conditions, one of which is that the plaintiff does not seek any relief greater than or different from the relief sought for the general public or a class of which plaintiff is a member.[6] (*Goldstein v. Ralphs Grocery Co., supra*, at p. 231, fn. 3; *Northern Cal. Carpenters Regional Council v. Warmington Hercules Associates, supra*, at p. 300.)

■ Here, Thayer seeks "general damages," "special damages," and, under Civil Code section 1780, subdivision (b), $5,000. General damages includes pain and suffering, emotional distress, and other "subjective" items. (*Beeman v. Burling* (1990) 216 Cal.App.3d 1586, 1599 [265 Cal.Rptr. 719].) Special damages means out-of-pocket losses that can be documented. And

---

[6] The other conditions are (1) the action, if successful, would enforce an important right affecting the public interest, and would confer a significant benefit on the general public or a large class of persons; (2) private enforcement is necessary; and (3) the action places a disproportionate financial burden on plaintiff in relation to his or her stake in the matter. (§ 425.17, subd. (b).)

Civil Code section 1780, subdivision (b) applies only to senior citizens. It is clear that Thayer seeks relief much greater than the relief sought for the purported class.

Thayer's next argument is that a breach of a settlement agreement reached in an underlying action is not within the SLAPP statute, an argument that consists of all of 11 lines, as follows: "In *Applied Business Software, Inc. v. Pacific Mortgage Exchange, Inc.* (2008) 164 Cal.App.4th 1108 [79 Cal.Rptr.3d 849], Applied Business Software, Inc. (ABS) sued Pacific Mortgage Exchange, Inc. (PME) in the underlying action, which the parties settled. Thereafter, ABS sued PME again, this time for an alleged breach of the parties' settlement agreement in the first action. In the second action, PME filed a special motion to strike the complaint pursuant to CCP section 425.16, asserting that it was retaliatory. The trial court denied PME's motion, and the appellate court affirmed. That court held that a breach by PME of a settlement agreement cannot 'reasonably be said to have been taken by defendant [PME] in furtherance of its right of petition or free speech in connection with a public issue. Page 1117." *Applied* is unavailing.

The setting there was that the two parties reached a settlement; later, one of the parties brought suit against the other for breach of the settlement agreement. (*Applied Business Software, Inc. v. Pacific Mortgage Exchange, Inc., supra*, 164 Cal.App.4th at pp. 1111–1114.) The court found that a claim for a simple breach of the settlement agreement after the underlying action had been concluded did not arise from constitutionally protected activity. (*Id.* at p. 1118.) This is not the case here, where Thayer's lawsuit claims a breach of an entirely different agreement—Mr. Thayer's agreement with Kabateck in connection with its handling of the Abercrombie & Kent litigation.

Thayer's final argument is that actions for breaches of fiduciary duty and fraud are not proper subjects of an anti-SLAPP motion, in claimed support of which Thayer cites the same two cases she cited below: *Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1271–1272 [99 Cal.Rptr.3d 805] (*Hylton*); *PrediWave Corp. v. Simpson Thacher & Bartlett LLP* (2009) 179 Cal.App.4th 1204, 1227–1228 [102 Cal.Rptr.3d 245] (*PrediWave*).)

Neither applies here, as any candid reading of the cases makes clear. Hylton sued his former attorney, defendant Frank E. Rogozienski (*Hylton, supra*, 177 Cal.App.4th at p. 1267), and PrediWave Corporation sued a law firm and a lawyer who had previously represented both PrediWave and its former president and CEO. (*PrediWave, supra*, 179 Cal.App.4th at p. 1209.) Both cases involved lawsuits by former clients against their former attorneys. Neither case stands for the proposition that the anti-SLAPP statute should not govern claims by a nonclient such as Thayer.

Indeed, both *Hylton* and *PrediWave* agree with *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658 [35 Cal.Rptr.3d 31]: if the plaintiff is a nonclient who alleges causes of action against someone else's lawyer based on that lawyer's representation of other parties, the anti-SLAPP statute is applicable to bar such nonmeritorious claims. The discussion in *PrediWave* is illustrative: "In determining the applicability of the anti-SLAPP statute, we think a distinction must be drawn between (1) clients' causes of action against attorneys based upon the attorneys' acts on behalf of those clients, (2) clients' causes of action against attorneys based upon statements or conduct solely on behalf of different clients, and (3) nonclients' causes of action against attorneys. In the first class, the alleged speech and petitioning activity was carried out by attorneys on behalf of the plaintiffs in the lawsuits now being attacked as SLAPP's, although the attorneys may have allegedly acted incompetently or in violation of the Professional Rules of Conduct." (*PrediWave, supra*, 179 Cal.App.4th at p. 1227.)

In other words, only the "first class" of claims—those brought by former clients against their former attorneys based on the attorneys' acts on behalf of those clients—may not be within the ambit of SLAPP. The other kinds of actions—"(2) clients' causes of action against attorneys based upon statements or conduct solely on behalf of different clients, and (3) nonclients' causes of action against attorneys"—are. (*PrediWave, supra*, 179 Cal.App.4th at p. 1227.) That, of course, is the situation here.

Finally, we note that *Jespersen v. Zubiate-Beauchamp, supra*, 114 Cal.App.4th 624, the lone case cited by the trial court, does not support Thayer. There, several plaintiffs sued their attorneys for their claimed mishandling of a civil litigation, resulting in a court order requiring the plaintiffs to provide verified responses to discovery requests, and ultimately causing them to be sanctioned. (*Jespersen v. Zubiate-Beauchamp, supra*, 114 Cal.App.4th at pp. 627–628.) The defendants filed a SLAPP motion, which the trial court denied. The Court of Appeal affirmed, concluding that defendants were sued "for their failure to comply with a discovery statute and two court orders to do so," conduct which did not amount to "constitutionally protected speech or petition." (*Id.* at p. 632.)

*Jespersen* was a garden-variety legal malpractice claim by clients against lawyers, clearly not within the SLAPP statute. (See *PrediWave, supra*, 179 Cal.App.4th at p. 1222.) Here, of course, Thayer was not a client. And no malpractice claim was alleged.

*Thayer Has Failed to Demonstrate a Likelihood of Prevailing on the Merits*

The second step in the SLAPP analysis is to determine whether a plaintiff has shown a probability of prevailing on the claim. Here, because the trial court found, however erroneously, that plaintiff's lawsuit was not within the SLAPP statute, it did not reach prong two. Nevertheless, we can decide it. (See *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 615–616 [129 Cal.Rptr.2d 546].) And we now turn to that decision.

■ We confirmed the applicable law in *Grewal, supra,* 191 Cal.App.4th at page 989: "We decide the second step of the anti-SLAPP analysis on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).) Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.' [Citation.] [¶] That is the setting in which we determine whether plaintiff has met the required showing, a showing that is 'not high.' (*Overstock.com, Inc. v. Gradient Analytics, Inc.* [(2007)] 151 Cal.App.4th [688,] 699 [61 Cal.Rptr.3d 29].) In the words of the Supreme Court, plaintiff needs to show only a 'minimum level of legal sufficiency and triability.' (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438 fn. 5 [97 Cal.Rptr.2d 179, 2 P.3d 27].) In the words of other courts, plaintiff needs to show only a case of 'minimal merit.' (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*[, *supra,*] 133 Cal.App.4th 658, 675 . . . , quoting *Navellier v. Sletten*[, *supra,*] 29 Cal.4th 82, 95, fn. 11 . . . .)"

While Thayer's burden may not be "high," she must demonstrate that her claim is legally sufficient. (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 93.) And she must show that it is supported by a sufficient prima facie showing, one made with "competent and admissible evidence." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236 [132 Cal.Rptr.2d 57]; see *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497 [45 Cal.Rptr.2d 624].) Thayer's demonstration does not measure up.

■ It is probably enough to note that Thayer was not, as she concedes, a client of Kabateck. Rather, she alleges she was a "third party beneficiary." Thayer has produced nothing supporting such a claim. And the two exhibits attached to the complaint—exhibits signed only by Mr. Thayer—do not support her.

The rule is that for one to succeed as a third party beneficiary, the contract must be "*expressly* for the benefit of a third party. Hence, a person only remotely benefited, or a mere *incidental beneficiary*, cannot enforce it." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 689, p. 776 and numerous cases and authorities there collected.)

Thayer's response to this is relegated to a footnote, where she observes: "Defendants contend that plaintiff has no ownership in the trust, and no standing to assert any of the claims which she makes in this action. [Citation.] That contention is simply fanciful. Plaintiff has alleged in her *verified* complaint that her spouse and defendants intended their contracts to affect her [citation], and defendants have adduced no evidence to the contrary. Hence, plaintiff is undeniably a third-party beneficiary of those contracts. [¶] Plaintiff was not a signatory of the contracts which are Exhibits A and B of her complaint. [Citation.] Nevertheless, she is an owner, along with her husband (who *was* a signatory), of the settlement funds of which the defendants were . . . trustees. Hence, her simultaneous status as a third-party beneficiary of those contracts is not a necessary qualification for her status as plaintiff therein."

■ To begin with, Thayer cannot rely on her complaint, even if verified, to demonstrate a probability of success on the merits. (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017 [85 Cal.Rptr.3d 838]; *Roberts v. Los Angeles County Bar Assn., supra,* 105 Cal.App.4th at pp. 613–614.)

■ Thayer cites nothing to show she was an "owner" of the "settlement funds." Moreover, various legal principles defeat Thayer's footnote, including that an attorney's duty depends on the existence of an attorney-client relationship: "If that relationship does not exist, the fiduciary duty to a client does not arise." (*Daniels v. DeSimone* (1993) 13 Cal.App.4th 600, 607 [16 Cal.Rptr.2d 615]; accord, see *Chang v. Lederman* (2009) 172 Cal.App.4th 67, 82–83 [90 Cal.Rptr.3d 758].) An attorney who undertakes to represent one spouse does not become the legal representative of that client's wife or husband: "A community property or marital interest in the spouse's recovery . . . does not create either an attorney-client relationship or a duty to the non-client spouse." (1 Mallen & Smith, Legal Malpractice (2012) Nonclient–Negligence, § 7.3, p. 762.)

Applying these and similar principles, courts have observed that "We are wary about extending an attorney's duty to persons who have not come to the attorney seeking legal advice and whom the attorney has never met." (*Hall v. Superior Court* (2003) 108 Cal.App.4th 706, 714 [133 Cal.Rptr.2d 806] [rejecting spouse's claim of privity with his wife's attorney]; see *Chang v. Lederman, supra,* 72 Cal.App.4th at pp. 82–83 [dismissing action against

attorney and rejecting "third party beneficiary" claims].) In short, Thayer cannot succeed as a third party beneficiary. Or on any other basis.[7]

In fact, Thayer makes no effort to support any particular theory, contenting herself with the argument that "not only is there a probability of success on the merits, in fact, plaintiff has already *achieved* success on the merits *vis-a-vis* herself." In claimed support of this argument, Thayer goes on to briefly assert as follows: that Kabateck held the settlement proceeds in trust for their clients; that they "notified their clients that unless they affirmatively 'opted-out of the Fraud Fund' by registered mail, postmarked no later than November 26, 2010, defendants would deduct 2.5 percent from their clients' net recoveries (the 'Fraud Fund') for use in a criminal prosecution of a specified person whom defendants had failed to sue in the underlying action. . . . In a later notice dated November 19, 2010, defendants asserted that if a beneficiary had not already opted out, it was then too late to do so. . . . November 19 was a full week *before* the deadline originally set by defendants for opting out. [¶] [Thayer], acting through her spouse, notified [Kabateck] by telephone that she did not want to contribute to the 'Fraud Fund.' [Citation.] [Kabateck] replied that [Thayer's] notification was too late, whereupon [Thayer] filed this action. [Citation.] Following that filing, [Kabateck] remitted to [Thayer's] spouse the net recovery *without* a deduction for the 'Fraud Fund.' [Citation.] But for the filing of this action, [Kabateck] would have donated $1,216.21 (2.5%) of [Thayer's] share of the trust fund to the 'Fraud Fund.' "

We do not understand the argument, other than to assert that somehow or another *Mr. Thayer* might have had some claim. He, of course, is not the plaintiff here—not to mention that he signed a release in the Abercrombie & Kent litigation.

## DISPOSITION

The order denying the SLAPP motion is reversed, and the matter remanded with instructions to (1) enter an order granting the motion, and (2) hold a

---

[7] We cannot help but observe that this is not the first time that Mr. Thayer has attempted to bring a lawsuit in his wife's name despite that he was the *only* signatory to the written agreement(s) in issue. Kabateck's request for judicial notice included a complaint in the San Francisco Superior Court entitled *Thayer v. Benjamin Franklin Plumbing, Inc.* (Super. Ct. S.F. City and County, 2010, No. CGC-09-486492), where the only agreement with defendant plumbing contractor was signed by Mr. Thayer. That case was dismissed by the trial court when a demurrer was sustained and Thayer did not amend. We recently affirmed the dismissal. (*Thayer v. Benjamin Franklin Plumbing* (Oct. 25, 2011, A129201) [nonpub. opn.].)

hearing, following further briefing, to determine the amount of attorney fees to which defendants are entitled under section 425.16.

Haerle, Acting P. J., and Lambden, J., concurred.

On June 22, 2012, the opinion was modified to read as printed above.