Filed 8/26/15  Shevitz v. Frankel CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MIMI SHEVITZ,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>STEVEN FRANKEL,<br><br>        Defendant and Respondent. | A141909<br><br>(Contra Costa County<br>Super. Ct. No. MSC12-02953) |

Plaintiff Mimi Shevitz filed an action against her former attorney, defendant Steven Frankel, arising from Frankel's representation of Shevitz in the attempt to renew her Marriage and Family Therapist (MFT) license and malpractice insurance.  Frankel filed a special motion to three of the causes of action in Shevitz's complaint, pursuant to the provisions of California's strategic lawsuit against public participation (anti-SLAPP) statute (Code Civ. Proc., § 425.16.)[1]  The trial court granted the motion, and Shevitz now appeals, contending the trial court erred in granting the motion because (1) her claims do not arise from activity protected by the anti-SLAPP statute and, in any case, the "illegality" exception to the statute applies, and (2) she has shown a probability of prevailing on the merits.  We conclude Frankel has not satisfied his burden of proving the affirmative defense that he has raised as the sole basis for claiming that Shevitz cannot satisfy the second prong of the anti-SLAPP statute:  that the

_____

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

communication in question was absolutely privileged pursuant to Civil Code section 47, subdivision (b). The trial court's order must therefore be reversed.

## BACKGROUND

On November 20, 2013, Shevitz filed a first amended complaint for damages (the complaint) against Frankel, alleging causes of action for (1) gross negligence and recklessness, (2) legal malpractice based on negligence, (3) breach of fiduciary duty, (4) breach of contract, (5) negligent infliction of emotional distress, (6) intentional infliction of emotional distress, and (7) slander.[2] The complaint contained the following factual allegations, which were incorporated into each of the seven causes of action. Shevitz had practiced as a licensed MFT for approximately 20 years, until her license was revoked on January 5, 2012. For many years, Frankel, a licensed attorney, as well as a licensed therapist, had provided consulting and legal services to Shevitz on issues arising in her MFT practice. On or about July 15, 2010, Shevitz retained Frankel to represent her in the renewal of both her MFT license, issued by the California Board of Behavioral Sciences, Department of Consumer Affairs (Board) and her malpractice insurance.

Frankel knew that Shevitz was living in a hotel after being flooded out of her house and that she "was living through a period of personal turmoil and hardship." In late 2009, Shevitz had attended a meeting of the California Association of Marriage and Family Therapists, at which she experienced hostility from one or more co-attendees. She discussed her concerns about this hostility with Frankel and asked him to communicate with the Board regarding this issue.

Shortly after July 15, 2010, Frankel notified Don Tsue, a senior investigator for the Board, that he was representing Shevitz. Frankel had a telephone conversation with Tsue on July 22, 2010, during which he told Tsue "multiple untruths," including that Shevitz was receiving treatment for a " 'psychological disorder' and was not ready to practice at the present time."

---

[2] Shevitz had filed her original complaint on December 19, 2012.

2

On August 1, 2010, Frankel sent Shevitz a bill for $1,365.00, which indicated that he had " 'conferred with client—spoke with Board of Behavioral Sciences Investigator—prepared renewal application for MFT Licenses, etc.' "

On September 28, 2011, the Board issued an Accusation against Shevitz related to her license renewal, which required her to complete a medical evaluation because of a pending complaint.[3] Because she had been flooded out of her home, Shevitz did not receive a copy of the Accusation until she retained counsel in the present action. Due to her failure to respond to the Accusation, the Board revoked Shevitz's MFT license in a December 6, 2011 default decision and order.

In November 2011, Shevitz contacted Frankel to inquire about the status of her license renewal, at which time he told her "that everything was fine, and did not inform her that there was anything that she needed to do or any problems with which [*sic*] she needed to be aware." In February or March 2012, Shevitz went to Frankel's office to pick up some boxes he had been storing for her since the flood. During that visit, she learned for the first time of her license revocation, when Frankel provided part of the Board's decision "to her agent."

Frankel purported not to know the substance of the complaint that had resulted in the Board's Accusation against Shevitz, and told her to contact the Board to find out. Thereafter, Shevitz tried to reach both the Board and Frankel more than one dozen times between March and May 2012. Frankel did not return any of her calls and she was unable to learn the substance of the underlying complaint from the Board. Frankel's mishandling of her license renewal caused damages to Shevitz resulting from the loss of her MFT license.

---

[3] Shevitz attached the Accusation as an exhibit to the complaint. The Accusation, which stated that Shevitz's MFT license was "currently inactive and will expire on November 30, 2011, unless renewed," alleged that Shevitz had failed to appear for an ordered psychiatric examination on August 22, 2011, and sought revocation or suspension of her license. (See Bus. & Prof. Code, § 820.)

In addition, the three causes of action that were the target of Frankel's subsequent motion to strike—negligent infliction of emotional distress, intentional infliction of emotional distress, and slander—included the following specific allegations. In the cause of action for negligent infliction of emotional distress, Shevitz alleged that she was the victim of "outrageous statements" by Frankel, which included "an untrue negligent misdiagnosis of the existence of a mental disease ('psychiatric disorder') that could potentially harm members of the public and significantly future therapy patients of [Shevitz]." She further alleged that these statements were particularly devastating to her "because of the preexisting relationship between them and his current assignment to act as an attorney to promote her best interest and what he had specifically been hired to do." She alleged that "a reasonable person hiring an attorney under the circumstances to be proven in this case, would be unable to adequately cope with the mental stress inflicted . . . ."

In the cause of action for intentional infliction of emotional distress, Shevitz alleged that Frankel's "conduct in failing to perform his legal duties to [Shevitz] under the Agreement[,] grossly neglecting her situation and failing to follow up with the Board before her license was revoked or to communicate to his client in a reasonable manner, and in making the false disparaging statements to the Board Investigator in direct contradiction of her interest constitutes outrageous conduct . . . ." She further alleged that Frankel's reckless and intentional conduct had a high probability of causing her emotional distress and that she "did in fact suffer[] extreme emotional distress as a result of [Frankel's] outrageous conduct."

In the cause of action for slander, Shevitz alleged that Frankel's oral statements to Tsue were false when made, "constitute[d] slander per se," and "were completely contrary to his duty for which he was specifically retained by [Shevitz]." She further alleged that Frankel's statements "were made both negligently and intentionally with malice and were intended to harm [Shevitz] because he was tired of working with her." She also alleged that the statements

4

"constituted a neglect by [Frankel] of his legal obligation to [Shevitz] and [an] outright betrayal of her identity as a MFT which she had worked so hard to attain, resulting in severe emotional distress . . . ."

On February 5, 2014, Frankel filed a special motion to strike the causes of action in the complaint for negligent infliction of emotional distress, intentional infliction of emotional distress, and slander, pursuant to section 425.16. In support of his motion, Frankel submitted portions of the June 27, 2013 deposition of investigator Donald Tsue, along with Tsue's December 31, 2010 report to the Board regarding his investigation of Shevitz.

In his deposition, Tsue testified that he worked for the Department of Consumer Affairs, Division of Investigation. The Board had referred an anonymous complaint it had received—about Shevitz's behavior at a continuing education course—to Tsue's division, and his supervisor asked him to follow up on the complaint. Tsue learned that Shevitz's license was delinquent due to her failure to pay the required fees. This meant that she was not able to practice as an MFT. Tsue testified that he left a business card at Shevitz's house with a note on it requesting that she call him. Shevitz never called him, but he did receive a call from Frankel.

In his final report to the Board, prepared on December 31, 2010, Tsue wrote that the Board had received an anonymous report about Shevitz's conduct at a continuing education event. It was reported that she had " 'exhibited a number of behaviors' which indicated [Shevitz] may not be fit to practice." Some those behaviors included "Frequent and dramatically inappropriate comments and interruptions during workshops. These interruptions were incoherent and could not be linked to the topics being discussed. [¶] Shevitz displayed extremely poor personal hygiene and a 'disheveled appearance.' [¶] Shevitz was consistently disruptive during the workshops. [¶] She displayed compulsive behavior including the use of hand sanitizers multiple times per hour. [¶] The complainant added that the behaviors were of sufficient severity that they believe Shevitz is

5

likely to be suffering from a significant mental illness and is unlikely to be safe to practice in her current state."

The Board was unable to reach Shevitz by phone or mail, after repeated attempts to contact her for a response to the complaint. Once the matter was referred to Tsue, he was not able to reach Shevitz either, but he learned that she had retained the services of Frankel to represent her in resolving her licensing status.

On July 22, 2010, Tsue received a phone call from Frankel, who informed him that he was representing Shevitz; he told Tsue "that Shevitz [was] not licensed as [an] MFT, nor is she employed as such." Frankel also told Tsue that Shevitz was "currently in treatment for a 'psychiatric disorder'[4] and have [*sic*] been in treatment for more than one year. Frankel said that Shevitz had several major personal events within the last year that affected her health. He continued to tell [Tsue] that Shevitz had a sewer line that ruptured inside her home, where raw sewage ruined all of her personal belongings. She is now living in a hotel until repairs to her home are completed.

"Shevitz['s] father passed away that same year, and then her health took a turn for the worst. Shevitz stopped her practice and had referred her clients to other therapist[s].

"Frankel said that Shevitz will continue with her practice after she is able to and she will submit the necessary fees and materials to the Board for re-licensure. He does not have a time frame when that will occur. Frankel related that Shevitz has not renewed her license as she is treating for mental health issues and he understands the Board's concerns; however, [he] does not wish his client to provide a statement at this time in her recovery."

---

[4] Tsue testified in his deposition that he had put the words, "psychiatric disorder" in quotes because "[t]hat's the information that Mr. Frankel provided to me."

6

On April 7, 2014, Shevitz filed a declaration in support of her opposition to Frankel's special motion to strike, in which she stated that she had retained Frankel to assist her in renewing both her MFT license with the Board and her malpractice insurance. Although she was not actively practicing as an MFT at that time, Frankel was aware that it was her goal to retain a valid license and to return to active practice. Shevitz further stated that she was not in treatment for any "psychiatric disorder" when Frankel contacted Tsue on her behalf. In addition, her father did not pass away in 2010, but actually passed away five years earlier. Shevitz was not suffering from any health problems in July 2010 that would have precluded her from practicing as an MFT. Finally, Shevitz stated in her declaration that Frankel had never advised her of the details of his conversation with Tsue.

On May 20, 2014, the trial court adopted its tentative ruling granting Frankel's motion as follows: "The claims for negligent infliction of emotion[al] distress . . . and slander . . . include protected activity because the gravamen of the claims is the statements made by [Frankel] to Inspector Tsue. The claim for intentional infliction of emotion[al] distress . . . contains allegations of both protected and non-protected activity. Since the protected activity, the alleged statements, do not appear to be incidental to the claim, this cause of action is also protected activity.

"There is no uncontroverted evidence that [Frankel's] statements to Inspector Tsue were illegal. [¶] . . .[¶]

"The litigation privilege applies to the statements made by [Frankel] to Inspector Tsue. [Citation.] Therefore [Shevitz] has not shown a probability of prevailing on the merits as to cause of action 5 for negligent infliction of emotional distress and cause of action 7 for slander.

"Cause of action 6 for intentional infliction of emotion[al] distress involves both conduct and statements and therefore the litigation privilege is not a complete bar to this claim. However, [Shevitz] has not provided any evidence that she

7

suffered emotional distress as a result of the actions alleged and for this reason, she has not shown a probability of prevailing on the merits on this claim."[5]

## DISCUSSION

### I. *The Anti-SLAPP Statute and Standard of Review*

Subdivision (b)(1) of section 425.16 provides that a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Subdivision (e) details the types of acts within the purview of the anti-SLAPP law, including, as relevant here, "any . . . oral statement . . . made in connection with an issue under consideration or review by [an] . . . executive . . . body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(2).)

"A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendants have made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fits one of the categories spelled out in subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. [Citation.]" (*Thayer v. Kabateck Brown Kellner LLP* (2012) 207 Cal.App.4th 141, 153 (*Thayer*), citing *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

" 'The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of

---

[5] The court also rejected Shevitz's claim that the "commercial speech exemption" applied. (See § 425.17, subd. (c).) Shevitz does not raise this argument on appeal.

grievances." (§ 425.16, subd. (a).)  Because these meritless lawsuits seek to deplete 'the defendant's energy' and drain 'his or her resources' [citation], the Legislature sought 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target' " [citation].  Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.'  [Citation.]" (*Thayer*, *supra*, 207 Cal.App.4th at p. 153, quoting *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)  Subdivision (a) of section 425.16 expressly mandates that the section "shall be construed broadly."

Our review of the trial court's ruling on Frankel's special motion to strike under section 425.16 is de novo.  (*Thayer*, *supra*, 207 Cal.App.4th at p. 153.)

## II.  *The Probability of Prevailing on the Merits*

As discussed, *ante*, the customary procedure in reviewing a challenge to the grant of a special motion to strike brought pursuant to section 425.16 is to first determine whether the challenged causes of action arise from protected activity, before moving to the second step of assessing the plaintiff's probability of prevailing on the merits.  (See *Thayer*, *supra*, 207 Cal.App.4th at p. 153.)  In the particular circumstances of this case, however, we find it unnecessary to address the question raised under prong one:  whether communications made by a defendant attorney on behalf of a client can ever constitute protected activity in a lawsuit filed against that attorney by the former client.  We therefore will proceed directly to the second prong:  the probability of Shevitz prevailing on the merits. (See *Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989 [in which a panel of this Division "resist[ed the] temptation" to engage in lengthy analysis under prong one, and went directly to prong two determination].)

In general, to establish a probability of prevailing on the merits, the plaintiff must demonstrate that the causes of action in question are " ' "both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." '

9

[Citations.]" (*Navellier*, *supra*, 29 Cal.4th at pp. 88-89.) Nevertheless, "a defendant that advances an affirmative defense to the plaintiff's claims bears the burden of proof on the defense." (*Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 969 (*Seltzer*).) In the present case, Frankel's only argument—both in the trial court and on appeal—is that Shevitz cannot prevail on the merits because his alleged communications were absolutely privileged under Civil Code section 47, subdivision (b).[6] Accordingly, he bears the burden of proving that Shevitz has no probability of prevailing against this defense. (See *Seltzer*, at p. 969.)

Specifically, Frankel argues that each of the contested claims is barred by the official proceeding privilege (which he and Shevitz both refer to under the umbrella term, "litigation" privilege). (See Civ. Code, § 47, subd. (b)(3) [a privileged communication includes one made "[i]n any . . . official proceeding authorized by law . . . ."]; *Hagberg v. California Federal Bank FSB* (2004) 32 Cal.4th 350, 362; cf. *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1172 (*Fremont Reorganizing Corp.*) ["The litigation privilege precludes liability arising from a publication or broadcast made in a judicial proceeding or other official proceeding"].)

Under subdivision (b)(3) of Civil Code section 47, "statements made in the course of 'any . . . official proceeding authorized by law' . . . are absolutely privileged. The [official proceeding] privilege applies to any communication made in such proceedings by a participant that has some connection or logical relation to the proceedings. [Citation.] The term 'official proceeding' extends to investigatory activities by public agencies. [Citation.] The privilege is not restricted to statements made once a proceeding has been commenced, but may

---

[6] Civil Code section 47, subdivision (b), provides, in relevant part, that a "privileged publication or broadcast" is one made "[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law . . . ."

apply to statements made in advance. ' "The 'official proceeding' privilege has been interpreted broadly to protect communication to or from *governmental* officials which may precede the initiation of formal proceedings." ' [Citations.]" (*Garamendi v. Golden Eagle Ins. Co.* (2005) 128 Cal.App.4th 452, 478, quoting *Hagberg v. California Federal Bank FSB*, *supra*, 32 Cal.4th at p. 365.)

Our Supreme Court has explained—in the context of the litigation privilege—that the purposes of the privileges set forth in Civil Code section 47, subdivision (b), "are to afford litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, to encourage open channels of communication and zealous advocacy, to promote complete and truthful testimony, to give finality to judgments, and to avoid unending litigation. [Citation.]" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1063.) Several court of appeal cases have held, however, that the litigation privilege does *not* apply in an action by a former client against an attorney for communications the attorney made in the course of representing that client. (See, e.g., *Fremont Reorganizing Corp.*, *supra*, 198 Cal.App.4th at pp. 1172-1174 [plaintiff in anti-SLAPP case could not demonstrate likelihood of prevailing on claims against former attorney based on litigation privilege]; *Kolar v. Donahue* (2006) 145 Cal.App.4th 1532, 1540-1541 [same]; *Mattco Forge, Inc. v. Arthur Young & Co.* (1992) 5 Cal.App.4th 392, 406 [same, in suit against expert witness plaintiffs had hired to assist in litigation].)[7]

In *Fremont Reorganizing Corp.*, *supra*, 198 Cal.App.4th at pages 1173-1174, the Second District Court of Appeal cogently explained the rationale for excepting attorneys who are being sued by their former clients from the broad

---

[7] Although these cases specifically discuss the litigation privilege (Civ. Code, § 47, subd. (b)(2)), their rationale is equally applicable to all of the privileges described in subdivision (b) of section 47, including the official proceeding privilege. (See Civ. Code, § 47, subd. (b)(3); cf. *Fremont Reorganizing Corp.*, *supra*, 198 Cal.App.4th at p. 1172.)

reach of Civil Code section 47, subdivision (b): "The litigation privilege, if applicable, would preclude essentially any action by a former client against an attorney for breach of professional duties arising from communicative conduct in litigation on behalf of that client. We believe that to allow litigation attorneys to breach their professional duties owed to their own clients with impunity from civil liability would undermine the attorney-client relationship and would not further the policies of affording free access to the courts and encouraging open channels of communication and zealous advocacy."

We agree with the holdings in *Fremont Reorganizing Corp.*, *Kolar*, and *Mattco Forge, Inc.*, and conclude that, in the circumstances of this case, Frankel may not use the official proceeding privilege to shield himself from liability for the misconduct alleged in the challenged causes of action, which all arise from his representation of Shevitz. Accordingly, Frankel, who has relied solely on this affirmative defense in his arguments related to this second prong of the anti-SLAPP analysis, has not satisfied his burden of proving that Shevitz has no probability of prevailing against his defense of privilege. (See *Seltzer, supra,* 182 Cal.App.4th at p. 969.) We shall therefore reverse the trial court's order granting Frankel's special motion to strike.

## DISPOSITION

The order granting the special motion to strike the causes of action for negligent infliction of emotional distress, intentional infliction of emotional distress, and slander pursuant to section 425.16 is reversed. Costs on appeal are awarded to Shevitz.

12

 

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.